Arthur R. TAVIS, Plaintiff and Respondent,

v.

William HIGGINS, Milton K. Higgins, and All Other Persons Unknown, claiming any estate or interest in, or lien or encumbrance upon, the property described in the complaint, Defendants and Appellants.

Civ. No. 8363.

Supreme Court of North Dakota.

Feb. 9, 1968.

Rehearing Denied April 22, 1968.

---

Rausch & Chapman, Bismarck, for plaintiff and respondent.

Vogel, Bair & Graff, Mandan, and Milton K. Higgins, Bismarck, for defendants and appellants.

STRUTZ, Judge, on reassignment.

This is an action brought in the district court of Burleigh County to quiet title to certain real estate described in the plaintiff's complaint as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18, Township 138, Range 80.

In an attempt to make the problems which faced this court somewhat more understandable, we have had two composite maps prepared, outlining the locations of the river in relation to the land in dispute, as such locations are established for different years by the evidence.

Map No. 1 shows the land as it originally was platted, when the Missouri River was confined to the area inclosed in the unbroken lines indicated by the General Land Office surveys. These surveys apparently were conducted on a piecemeal basis, over a period of years, since the solid lines inclosing the river show that various parts of the boundaries of the stream were established by surveys during the years 1872, 1874, 1878, and 1892. However incomplete the early surveys may have been, the purpose of the map is to show the land in dispute as it originally existed in Burleigh County and as it was affected by the meandering of the Missouri River from time to time in relation to the land in Morton County held by the defendants, or their predecessors in interest, who claim the plaintiff's land as accretion to such Morton County lands.

Map No. 2 shows the land in dispute as it now exists. The Missouri River may be seen to have reverted to approximately its original channel—as shown by the early surveys on Map No. 1—as against the 1938 U. S. Aerial Survey showing the land to have been almost completely inundated by the eastward meandering of the river.

These maps show the property described in the plaintiff's complaint as the dotted area in Section 18, rectangular in shape and designated as "Lot 5" and "S½SE¼." As will be seen from these maps, the "island" to which the defendants claim title is that area on the maps designated by the perpendicular lines. If the defendants' contentions have been established by the record, then this "island" would extend to the middle of the main channel of the Missouri River as it is shown by the U. S. Aerial Survey to have existed in 1938. It will be noted from these maps that the river washed away or submerged much of the property claimed by the plaintiff in this action and that, when it reached its 1938 location, most of the plaintiff's land either was displaced or was inundated and that only a small tract in the extreme southeast corner of the South Half of the Southeast Quarter (S½SE¼) remained. (See Map No. 2.) Thereafter, the

NO. 1

MISSOURI RIVER CHANNEL CHANGES (Compiled by State Water Commission)

General Land Office Surveys (1872-1874-1878-1892) ⌒⌒⌒⌒

Missouri River Commission Survey (1891) — —·— —·—

Plat of Lots in Sec. 18 from Atlas published by Geo. A. Ogle & Co.,
   Chicago (1912) ------·--

U. S. Aerial Survey (1938) — — —·— —

Area surrounded by Missouri River claimed·by defendants as accreted
   island |||||||||

NO. 2

PRESENT CHANNEL OF MISSOURI RIVER (Compiled by State Water Commission)
    from State Hwy. Dept. aerial photo (1966) and U.S.G.S. Quadrangle
    (1962) —·—·—·—
U. S. Aerial Survey (1938) —·—·—·
Land described in contract for sale between Bd. of Univ. & School Lands
    and Wm. Higgins (1945) and quitclaim deed (1961)
Land claimed by Tavis under quitclaim deed (1939) to SE¼SE¼ of Sec. 18-138-80
    from Bismarck Realty Co.; quitclaim deed to SW¼SE¼ and Lot 5 from
    Julia B. and W. A. Leach (1949); and County Deeds from Burleigh County
    to SW¼SE¼ and Lot 5 and to SE¼SE¼
Land claimed by defendants as island accretion to west bank of Missouri
    River under quitclaim deed from Katherine Borden to Wm. Higgins
    (1951)

land was restored. There is no evidence that the restoration was by a gradual process, so the plaintiff cannot contend that it was rebuilt by accretion to what land had remained unsubmerged in the southeast corner of the South Half of the Southeast Quarter (S½SE¼).

The defendants' property located in Morton County, to which they claim the "island" was accreted by slow and imperceptible means to the banklands on the Morton County side of the river, is indicated in both maps as the polka-dotted tracts in Sections 12 and 13, Township 138, Range 81. It will be seen that, in the earliest Government surveys, the land described in the complaint which is claimed by the plaintiff was east of the main channel of the river, and thus was located in Burleigh County. The defendants admit that they never have received any deed or other conveyance to the property described. They contend, however, that the land claimed by the plaintiff, which formerly occupied the location which is designated as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80, was slowly eroded and washed away by action of the river until only the very southeast corner remained. Thus, because it no longer was in existence, this land was not taxable. They further contend that, as the land was eroded along the east bank of the river, it was built up as accretion on the west bank to tracts in Morton County belonging to the defendants; that this area, over the years, has been built up by the slow and imperceptible process of accretion, thus becoming a part of the banklands, and that such accretion covered the area where the land formerly designated as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18 had been located. Thus, the defendants contend, since the present area, which formerly had been occupied by the land claimed by the plaintiff, was formed by accretion to the Morton County land of the defendants, no part of the land described in the plaintiff's complaint now remains in existence in Burleigh County.

The defendants further contend that the tract which was so accreted to their Morton County property became an island when it was cut off from Morton County by subsequent avulsive action of the Missouri River, and that this island, after being cut off, itself grew by the process of accretion and that it now occupies, in addition to other lands, the location of the land described in the plaintiff's complaint; that the defendants are the owners and are entitled to possession of all of this island, including the property claimed by the plaintiff in this lawsuit.

Thus the defendants claim title to the southeast part of this island, a portion of which, the defendants contend, occupies the same location formerly described as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18 which is now claimed by the plaintiff; that their claim arose by reason of the defendants, or one of them, being the vendee under a contract for deed from the Board of University and School Lands to the Southwest Quarter of the Southeast Quarter (SW¼SE¼) of Section 12 and Lots 1 and 2 of Section 13, Township 138, Range 81, in Morton County; that the land described by the plaintiff in his complaint was accretion to the property so acquired and owned by the defendants in Morton County; that the defendants further claim title to the "island" by reason of a quitclaim deed dated July 20, 1951, from Katherine Borden to the defendant William Higgins.

The defendants further claim that they and their predecessors in interest have been in exclusive, open, and adverse possession of the island for more than thirty years prior to 1939. The defendants also point out that they have spent large sums of money clearing the island, planting alfalfa, constructing a causeway by hauling and placing some 2,000 tons of rock and broken cement in such causeway for a crossing and for the purpose of protecting the island

from erosion; that the plaintiff has exercised no right of possession or control over any part of the island.

The defendants also point out that the defendant William Higgins brought an action to quiet title to the island in 1952, and that a judgment quieting title thereto was entered in the district court of Burleigh County on January 18, 1955, which judgment declared William Higgins to be the owner in fee simple of all of the island, with certain exceptions affecting mineral rights and not material here; and that such judgment barred all persons unknown who claimed any interest or estate in said property from any interest therein. The defendants therefore contend that such judgment bars any claim of the plaintiff to any part of the island, including the property described in the plaintiff's complaint.

It is conceded that the river washed away much of the property claimed by the plaintiff in this action until most of it was either displaced or was submerged. (See Map No. 2.)

On this record, the trial court found that the land in dispute was in Burleigh County and ordered title quieted in the plaintiff. From the adverse judgment entered on such order, the defendants have appealed to this court, demanding trial de novo.

█ At the very outset of our consideration of this appeal, we are faced with the question of jurisdiction because the defendants contend that the land claimed by the plaintiff lies in Morton County. If this contention is correct, the district court of Burleigh County is without jurisdiction in this action since our law specifically requires that any action affecting real property must be brought in the county in which such land, or a part thereof, is located. See Sec. 28-04-01, N.D.C.C.; Johnson v. Johnson (N.D.), 86 N.W.2d 647.

The dispute in this case arises as a result of the vagaries and the whims of the Missouri River in years gone by and the fluctu-

ation of its main channel from one location to another. During the trial, exhibits were introduced which clearly showed the instability of this stream. The maps, which heretofore have been referred to, show the location of the river from time to time. They also show the location of the land which is in dispute in this action and the island claimed by the defendants which includes the land claimed by the plaintiff.

It is undisputed that Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80 was east of the main channel of the river, and thus in Burleigh County, at the time of the original Government survey in 1872. We also find from the record in this case that the present location of the area in dispute, subsequent to the aerial photo of 1938 and subsequent to the avulsive change in the river which occurred in 1938 or 1939, is east of the main channel and has been east of the main channel since that time.

█ In order to establish their claim to the land described in the plaintiff's complaint, the defendants must prove that this property was accreted to tracts which they own in Morton County. Where a defendant in an action to quiet title claims to be the owner of the property and seeks to have title quieted in him, he has the burden of proving the allegations of his claim and, in effect, becomes a party plaintiff. Woodland v. Woodland (N.D.), 147 N.W.2d 590. Thus the defendants in this action must establish not only that the land described in the plaintiff's complaint was slowly and imperceptibly washed away by action of the river, but that what now is described as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80 was added to their Morton County holdings by the process of accretion; that after such accretion to their Morton County land, a sudden and avulsive change of the main channel caused the property which had so accreted to their Morton County property to be suddenly and abruptly cut off from Morton County and that, as a result, al-

though such land now is east of the main channel, it remains a part of Morton County. The fact that most of that accretion was cut off by the new channel in 1938 by avulsive action would not change the county of its location or its ownership.

Thus, the defendants contend that they have established by the record that the land in question, described in the plaintiff's complaint, was, in fact, accreted to their Morton County property by a slow imperceptible process, and that therefore this property belongs to the defendants and not to the plaintiff.

We have carefully examined and re-examined the record in this case. We find that, from the time of the earliest Government survey until 1938, the location of the Missouri River was not permanently established in any one location, but that it constantly shifted and changed. By 1938, the river had moved to the east so that much of the property described in the plaintiff's complaint was either to the west of the east edge of the river, or was covered by the stream of the river. A small tract of what originally had been described as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80 remained untouched by the movement of the river. The unaffected portion of the tract was in the southeast corner of the South Half of the Southeast Quarter (S½SE¼) of such property.

The record before us fails to disclose that any part of the territory to which the plaintiff is attempting to quiet title was slowly and imperceptibly built onto any holdings of the defendants in Morton County. A careful examination of the record and a study of the maps will disclose beyond question that if any part of the land claimed by the plaintiff was accreted to land in Morton County, it was accreted to land other than that owned by the defendants. Any accretion to the land owned by the defendants in Morton County would be far to the north of the land involved in this action. Thus the record fails to support the defendants' claim that the land in dispute in this action was accretion to defendants' Morton County property.

We further find that the defendants have not acquired title by adverse possession to the property described in the plaintiff's complaint. To gain title by adverse possession, the person claiming title must establish that he, either alone or including those under whom he claims, has been in actual, open, adverse and undisputed possession under color of title for a period of ten years and that he, either alone or including those under whom he claims, has paid all taxes and assessments legally levied thereon for such period. Sec. 47–06–03, N.D.C.C. The defendants concede that they have paid no taxes on the property described in the complaint. They contend that they have paid taxes on their Morton County property, and that the property described in the complaint, being accretion to such Morton County land, thus was taxed as a part thereof.

We further find that the defendants have also failed to establish that they have been in adverse possession for a period of 20 years. The defendants do not claim title based on a written instrument or judgment. To constitute adverse possession by a person claiming title not based on a written instrument or judgment, such land is deemed to have been possessed or occupied only when it has been protected by a substantial inclosure or where it has been cultivated or improved. Sec. 28–01–11, N.D.C.C.; Woodland v. Woodland (N.D.), 147 N.W.2d 590. The burden is on the one claiming property by adverse possession to prove his claim by clear and convincing evidence, and every reasonable intendment will be made in favor of the real owner. Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W.2d 492.

We find that there is no proof that the land claimed by the plaintiff ever was accreted to land belonging to the defendants in Morton County. It is clear, from a study of the maps, that the land claimed

by the plaintiff in this action, if it had been formed by accretion to Morton County land, would have been accretion to land other than that owned by the defendants or their predecessors in interest. The land claimed by the plaintiff, Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80, if it were formed by accretion to Morton County land, as claimed by defendants, clearly would have been accretion to land in which the defendants are not shown to have had an interest at any time.

All that the defendants have established is that the main channel of the river did, in fact, move from its location at the time of the earliest Government survey to its 1938 location; thereafter, the main channel suddenly returned to approximately its original channel. There is no competent evidence whatsoever to prove that the tract which is claimed by the plaintiff was, in fact, accretion to defendants' Morton County land.

All persons who had known of the situation which existed during the years from 1872 until the early part of this century, when much of this area was formed, either are dead or are not available as witnesses. We seriously doubt whether any proof can ever be produced to show just how this land was formed. There is proof in the record that there is a ridge in the center of the island, of considerable width and length, that is much higher than the territory surrounding it; that on this ridge the soil is of a different composition and the trees are larger than those on the remainder of the island. It is doubtful whether this particular portion of the island, at least, ever was washed away and rebuilt by accretion. At any rate, we find that the record before us does not establish that it was.

█ Where the boundary between two counties is fixed by law as the middle of the stream or channel of a river, such law must be construed as referring to the channel as it existed at the time of passage of the law.

An artificial or sudden change by avulsion, or otherwise, in the course of such stream which defines the boundary between two counties, causing a new channel to be formed, does not change the boundary. But where such change is gradual and imperceptible, the rule is otherwise. 20 C.J.S. Counties § 15, p. 765, at p. 766.

Therefore, having concluded that the defendants have failed to establish that the land claimed by the plaintiffs was gradually and imperceptibly accreted to Morton County, we construe the boundary between Morton and Burleigh counties as fixed by law when such boundary was first established by Chapter 18 of the Session Laws of 1873, Dakota Territory.

The defendants concede that the land claimed by the plaintiff was situated east of the main channel of the Missouri River when the boundary between Morton and Burleigh counties was first established by law. They further concede that it now is located east of the main channel of the Missouri River and that it has been so located since the river returned to its original channel in about the years 1938 or 1939. This land has been taxed continuously in Burleigh County. It being undisputed that, at the time of the commencement of this action, the land in question was located east of the river, the Burleigh County district court has prima facie jurisdiction of the action.

█ Defendants make a further claim, that title to the tract in dispute was quieted in an action commenced by William Higgins in 1952, which resulted in a decree of the district court of Burleigh County on January 18, 1955, declaring defendant William Higgins to be the owner in fee of all of the island, including the area claimed by the plaintiff, subject to certain mineral reservations. This decree bars all persons unknown who claim any interest in or title to any of the said property.

It is undisputed that the plaintiff was not named as a party defendant in the quiet-

title action brought by the defendant William Higgins. The plaintiff's interest in the property described as Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80 was of record at the time the defendant brought his quiet-title action, but plaintiff was not made a party defendant. The action to quiet title in defendant William Higgins did not, therefore, affect whatever title or interest the plaintiff had in such land, since plaintiff's interest was of record. Only persons whose interests in the land do not appear of record may be proceeded against as persons unknown. Sec. 32–17–06, N.D.C.C.; Stewart v. Berg (N.D.), 65 N.W.2d 621; Nystul v. Waller (N.D.), 84 N.W.2d 584. All parties whose interests appear of record must be named and served, or their interests are not affected by such action.

Having determined that the Burleigh County district court does have jurisdiction in this action, and that defendants have not established their title to the land in question, we now must determine whether the plaintiff has established his title to such land and whether the plaintiff is entitled to judgment quieting title in him.

The plaintiff bases his claim to the described land, Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80, on county deeds issued in Burleigh County, dated in 1949, and on a quitclaim deed from the Bismarck Realty Company to the Southeast Quarter of the Southeast Quarter (SE¼SE¼) dated in 1939. The Bismarck Realty Company first acquired title to this property in 1903; it then conveyed title by warranty deed to the Bismarck Bank in January of 1912 and received a warranty deed back from the Bismarck Bank in April of 1917. The plaintiff further bases his claim to title to the land described as the Southwest Quarter of the Southeast Quarter (SW¼SE¼) and Lot 5 of Section 18 on a quitclaim deed dated in 1949 from Julia B. Leach, whose interest in this property in turn was based on a deed from Burleigh County in 1949.

One of the exhibits in this action is the 1873 Governmental Survey of Township 138, Range 80. It shows that the property claimed by the plaintiff in this action, Lot 5 and the South Half of the Southeast Quarter (S½SE¼) of Section 18–138–80, was all nonriparian at the time of this first survey. Thereafter all of Lot 5 and a portion of the South Half of the Southeast Quarter was either eroded away or was inundated by the river. Thus the river moved and cut into nonriparian land. Subsequently this land was restored. When it was restored, since it had been nonriparian at the time of the original survey, it became the property of the plaintiff and his predecessors in title. As we said in Perry v. Erling (N.D.), 132 N.W.2d 889, when the river moves and cuts into land which was nonriparian and some of it is eroded away, and thereafter it is restored by accretion to land which originally was so nonriparian, the owner of the land which originally was nonriparian has title to such accreted land up to the boundaries of the original nonriparian tract. Thus the plaintiff and his predecessors have title to the land in the original description after such restoration.

For reasons set forth in this opinion, we affirm the judgment of the district court and find that, as between the plaintiff and the defendants, the plaintiff is entitled to have his title quieted to the land described in the complaint.

TEIGEN, C. J., and ERICKSTAD and KNUDSON, JJ., concur.

PAULSON, J., not being a member of the Court at the time of submission of this case, did not participate.